Counsel, you may proceed. Good morning, Your Honors. Bill Schmidt for the appellant and plaintiff in the underlying case of the estate of Javier Garcia Gaona. The district court granted summary judgment based on the second prong of qualified immunity. To that issue, did the defendants have fair notice that their conduct was not constitutional? Now, what must be established is that the conduct, the use of force, was unlawful. Not that the facts were clearly established. General statements of law are not inherently incapable of giving fair notice and clear warning to the officers. So when they started to shoot the beanbags, did the officers warn your client? No, they didn't. Well, wait a minute. Is it your position that when the officers lifted the shotguns and didn't shoot right away, Mr. Garcia was not aware that they were about to shoot? No, that's not my position. I didn't think so, because he was saying, shoot me, shoot me, shoot me. Yes, he was. He was suicidal. So he knew that they were readying to shoot him. Correct, Your Honor. In fact... Is that not a warning? Pardon me? Is that not a warning? I would consider it a warning. I took the question being a verbal warning. That's what I intended the question to mean. Especially given the suicidal and distressed state that Mr. Garcia... how do you refer to him? Mr. Gaona. Gaona was in. That's only one of the factors under Glenn to be considered, or Dorley. The other factors would be whether he was an immediate threat to the officers. And he was not an immediate threat. That's the most important factor in using the beanbags. There has to be a serious governmental interest. The governmental interest must be strong. There's no published cases that say that using a significant amount of force to stop someone from attempting suicide is reasonable or lawful. Are there any cases that have this kind of, I will call it, public activity that is in most of them, they're in a house, or they're going into a house, or something like this. The immediacy, or my queerst question about immediacy, is this was in a large public area with people still around, and something had to be done at some point. That is, is it your view the alternative would just be to wait till nightfall? That would be one of the alternatives, Judge Boggs. The other alternative would have been another use of force in the continuum between doing nothing and, in effect, using deadly force. But first off, of course, the force they used wasn't meant to be deadly, and it wasn't, in fact, deadly. And the alternatives, I noticed one of the experts is canines. I was on a case where they sent in a dog, and the dog killed the man. And, of course, he then sued, because you used deadly force. As between beanbags, dogs, you know, they're not attempting to kill him. Is there anything that's clearly established as to, once you can use some kind of force that helps us at all, or helps them in knowing how to draw a line? Well, in other words, what other alternatives were available to the police in this situation? Well, I think the other way to look at it is what they can't do. And it's clearly established under Dorley and Glenn that the use of force in the pleadings and testimony is a disputed fact. They used lethal force initially, a Fourth Amendment violation, before the shooting. Even though they were not only not lethal, they weren't even very effective. No, they weren't. But they aimed at an area that they're specifically trained not to. And the precedents, the cases state beanbags are lethal force. Dorley and Glenn state that specifically. It's considered lethal force in the Ninth Circuit, especially the way they used it. And they admitted that. That was undisputed. I think you're not going to address the issue as to what other alternatives were available to the officers, reasonable alternatives. Well, SWAT was there or on the way. They had tasers. Our expert testified, I believe. Who was on the way? SWAT? Well, they already had negotiators there and they had a bunch of policemen. There were. What was SWAT at? Perhaps shields, just perhaps something else. And I know it appears that we're speculating, though. But there were other options and time was on the side. They had tasers and that's considered an intermediate level of force, right? Yes, Your Honor. So that would be a lesser level of force available to the officers. Yes, Your Honor. I thought I mentioned that. There's a continuum. Time was on the side of the officers that were there. Often these standoffs, if you will, last two and three hours, four hours till nightfall. He was getting tired. He was sitting down, standing up. Often they just wear them out. I'm really concerned about the use of the term FBI trained experts. One day of training with the FBI makes you a trained FBI expert in this area. Our expert also testified to the extent that what they did was wrong, bringing up things such as it's a sin to shoot yourself. You're trained as an FBI negotiator not to bring up any type of religious issues unless it's brought up by the suspect. They had time on their side. There was no reason to rush this and there is specific law on that. Under Dorley, the potentially dangerous situation is not the type of government interest that standing alone justifies the use of force that may cause serious injury. And Dorley was a beanbag. Dorley was a beanbag situation. Dorley was not out in a large public area that they apparently were unable to seal off completely without shutting down the city in that area. So there were other people in the area. But they weren't in danger. Nobody was in immediate danger. They had him contained. And that sort of gets to this question of immediacy in the sense that in fact at any time he could have come at the officers as he ultimately did. He could have come at and out into society, in which case shooting at him would have endangered others. I mean my real problem with this is clearly things went bad compared to almost all the other cases. They weren't acting hastily. They had options and many of those options you might well have been here when they used them and something went bad. The dogs, the tasers. I've been on many taser cases where something goes bad when you use tasers. That's my problem is how do you, when there are many alternatives, you say that you simply should have used a different one or do you say they had a range of options and they picked one and it turned out badly? I think that's part of the analysis under Glenn. That's one of the things that you look at. Most importantly does... And you look at those factors in the end to decide was this reasonable. Is that right? Yes. Okay. All right. That's fair. Judge Boggs, you actually in King used a case of or an instance of lethal force, a handgun, to find that deadly force was unreasonable in a chokehold after the incident had concluded, if you will. The suspect was King, the officer, the detective used the chokehold. The case you used to justify it was a gun case and I thought that was interesting in the applicability to the second prong here because I'm not sure... Or is that K-I-N-G King or K-E... K-I-N-G. You actually... I've had several King cases. February 2019. Yeah. Yeah. Okay. You joined. Yeah. There's some famous, famous ones. Okay. Which is different than I think Judge... Is it Bay or Bea, Your Honor? Bea. Bea. Bea. I got both of them wrong. Judge Bea, last week or the week before, you joined a dissent in Slater, which was, I think, contrary to the King case in where you held that the United Circuit was still going in the wrong direction on qualified immunity and using too general of facts. You talked about... Want to compare the facts in this case to Diorly? Yes. Diorly, yes. There seemed to me to be some real differences between the facts in this case and Diorly. In Diorly, they observed Diorly for five or ten minutes. Here they were talking to Guyona, as you call him, for half an hour. In Diorly, they didn't wait for the negotiators to arrive. Here they waited for the negotiators to arrive and the negotiators tried for some time to talk him down. In Diorly, they told him to put down his crossbow. He did put down his crossbow. They told us, Guyona, to put down his knife. He just wouldn't do that. In Diorly, he was on his private property with nobody from the public endangered by his actions. Here, he was in a public place. Those are the differences which, at a level of generality for warning purposes to police officers, make a difference. I don't think warning is the issue and also in Diorly, he threatened the officers. He told them he was going to hurt him and he was approaching the officers when the beanbags were used. That is a difference. Those are differences, I believe, that weigh in the favor of Mr. Guyona. That's the one element that weighs in favor of Mr. Guyona. The other elements all weigh against him. But you're focusing on the warning. I'll give you that. No, no, no. The warning to the police officers that their actions are violative of clearly established constitutional norms. That's what the whole purpose of qualified immunity is, to let officers on jobs know what they should or should not do. You were talking about the warning in qualified immunity, not the warnings. I understand. He was talking about notice. He was talking about putting the police officer on notice. If they engage in certain conduct, it would be wrong. Call it notice. Put them on notice. Yes, Your Honor. But there's clear law on that on the Talk about the governmental interest in using the force. Whether there was an immediate threat to officers or others. That's the most important. There was no immediate threat here when they used the beanbags. The severity of the crime at issue. Mr. Guyona had not committed any crimes. He had gone to a bank door and shaken them while they were about to open, and then he left and walked down the road. Later, he did show a knife. But when he was up against the wall, he wasn't a threat to anybody, and he had committed no crimes. Didn't he, quote, show the knife or advance on the officer at the bank? No. You're talking about the only allegation of any showing the knife or advancing would have been when the officers arrived and he's trying to make his way over to have protection or something at his back. But no, the officer actually didn't arrive at the bank. The officers became aware of the bank by telephone call, correct? Correct. They didn't see him at the bank. Correct. There was a call from the bank that somebody in a dark hoodie carrying a bag had tried to open the doors and they felt uncomfortable. They didn't feel threatened. They didn't feel, you know, it wasn't a serious situation. Another citizen called in and said that Mr. Gaona was carrying a knife. Are you limiting your claim to the beanbag damages or also to the death? Well, Mendez wasn't decided until 2017. Mendez overruled Billington when the Supreme Court said that the provocation rule of the Ninth Circuit was bad. Okay. In this case, we're alleging there was a Fourth Amendment violation by the use of the beanbags. It was a continuing incident. That Fourth Amendment violation automatically made the lethal shooting unreasonable and unlawful, even if it was a good shooting. The second argument is it's the totality of the circumstances under Graham. And even if it wasn't a Fourth Amendment violation, you still have to consider that they caused this shooting by expediting and not waiting and shooting him with the beanbags when he did not pose an immediate threat. And under precedent, it was unlawful under Dorley, Mercado versus the city of Orlando and the other cases cited in my brief. All right, counsel, you set your time. Let's hear from the other side. Thank you. Good morning, Your Honors. May I please put the Court to Bruce Prate on behalf of the appellees and defendants in this matter. Just to address Mr. Smith's points, taking the last point first, perhaps, that if I understand his argument, because Billington was the law on the Ninth Circuit at the time, the provocation rule, that somehow these officers were on notice that they would be violating what the Supreme Court later decided was unconstitutional law. Quite frankly, that just makes no sense that you would hold an officer responsible for violating what was later determined to be unconstitutional. The provocation rule does not apply. With respect to some of the questions raised by the Court, in terms of DRL, or I'm not sure how you pronounce that case, it's obviously been rejected. Dorley. Dorley, thank you. By the Supreme Court in Sheehan, and the courts have been instructed not to read that case too narrowly. And as the Court has already pointed out. Not to read the case too broadly. Thank you. Thank you. Yeah, the facts are very different in that case. That was at a house, whereas this, as the Court has seen from the video, is in public. Looking at the video, the public was cordoned off. I mean, just going to the beanbag situation, the public was cordoned off. And at the time of the beanbags, he was not moving away from the sign. He was shifting. Obviously, watch the video. He was shifting back and forth, but he wasn't coming out toward the public or even toward the police. So I have a problem with the issue of the immediacy of the danger. Because if you watch the video, up in that period, his back's against the wall. He's shifting side to side, but he doesn't look like he's coming at anybody.  What happened and what Sergeant Mengel said at that point was, and if you noticed in the video, he has at that point very clearly changed his posture, looking to his left, looking to his right, so that the sergeant said, we can't let him get away from this backdrop. If we allow him to get away from this marquee, we're going to be shooting beanbags or whatever into the crowd. As soon as he started making those furtive gestures was when they decided we've got to try to stop him from getting to that crowd. I don't think there's any requirement that they wait until he runs five feet to the outer perimeter of the marquee. They didn't shoot him then. They shot him with the beanbags. Were you, do you contend Guyana was under arrest at the time the officers shot at him with the beanbags? He was certainly detained. There was probable cause to detain him. What was the probable cause? As their expert pointed out, there was certainly good cause to believe he was casing the credit union for a possible robbery. And that's the misnomer of this whole thing is that he was somehow suicidal. Unlike Diorre or Glenn, there was no evidence and no report that he was suicidal. And, in fact, the officers – So isn't there some point where he like jumps up and – After he was shot with the beanbags. That was afterwards? Right. After he was shot with the beanbags, the whole time he had the knife to his throat. But what the officers clearly observed, which was important to them, is no time did he slice himself. In fact, he was encouraging them, which they interpreted to mean, if you try to come get me, this is what I'm going to do to you. Well, I – oh, that seems so unreasonable based on what I saw in the video. It seemed as though he was – I mean, it looked like he was threatening to knife himself, not the cops. Well, but the interesting thing is, at no time, even though he's gesturing like this, did he cut himself. Right, but you're saying he has to commit suicide before the cops can deem him suicidal? No, but unlike Diorre or Glenn, there was no report. The only report was he was casing a credit union right before opening, and to answer Judge Boggs' question, he did pull the knife on the first officer who confronted him, and then he moved – after he'd left the credit union, when the first officer contacted him in the street, he pulled the knife, and that officer did not shoot because there was a work crew behind him in the street. You're saying in the street, this was before he gets to what you call the marquee. To the marquee, correct. With respect to the alternatives, I know the court had suggested perhaps a taser. The problem with a taser is you have to get within less than 20 feet of him, which would mean these officers would have had to advance on him, hoping that the taser, which is often ineffective, might have worked, and now they've placed themselves in a position of potentially being stabbed by the knife. And certainly the Ninth Circuit in Scott v. Hendricks has said, you don't have to choose the least intrusive, only that your choice of force be objectively reasonable. And the U.S. Supreme Court in Scott v. Harris said the same thing. The question is not, was there some alternative? The question is, was the alternative that they chose objectively reasonable? It's a single question. Did they give him any warning that they were going to shoot the beanbags? Well, as Judge Baez said, they're standing there with guns – Drop your knife or we're going to shoot you with the beanbags? Well, you know, and that's a problem that we see in all these cases is that is a uniformed police officer – I think it's your answer, Mr. Paredes, no. They didn't give him any warning. They did not give him a verbal warning. That's correct. But I think any person – They had asked him to drop the knife earlier, though. They had asked him many times to drop the knife. They had pleaded with him to do so. So I don't think that they have cited any clearly established law on the issue, which is really before the court, and that is the clearly established prong of qualified immunity. Because these facts are so distinguishable, he was out in public. There was a crowd of over 100 people nearby. He is an immediate threat to them. If he gets beyond that marquee, they tried desperately to stop him with anything but lethal. And unlike the case in Glenn where they shot him with lethal force, when he turned away from officers, Mr. Gaona actually got up from the less-than-lethal and charged at the officers with a knife. I know the officers say that it looked that he charged with them at the knife. It also looked like from the video he was stumbling and went in front of the car and not at the officers. Well, there's officers everywhere. There's no question, it's absolutely undisputable that he ran in the direction of the officers. He didn't run away back towards the marquee. He didn't stay on the ground where he had been knocked down. He got up, lunged at the officers. He's leaning forward. That's true. But he is running. It's totally undisputable that he's running at the officers with a knife thrust forward when they finally had to resort to deadly force when he's within less than 20 feet. I don't know if the court has any other questions. Other questions? No, thank you. Thank you. Judge Boggs, was that Robinette v. Barnes? Yep. I use that case frequently. Thank you. That's the dog case. I also had a taser case where the cops taser this guy to almost no effect. He comes over, beats the crap out of him, at which point they shoot him. Okay. I just wanted to put Robinette. Thank you. All right. I'll give you a couple more minutes. I don't want to see another suicide by cop turned into a homicide by self-defense. This happens too often. I have other cases like this in my office. I just heard a lot about, well, if he would have run, we couldn't do this. You know, and if we would have used a taser, it might not have worked. Well, that kind of argument works both ways, as does the argument about clearly established and what the officers were aware of and what the law was at the time of the shooting. And Billington was the law at the time of the shooting. Billington was not overruled by Mendez until 2017. If there was a Fourth Amendment violation that led to the shooting, to the death, to the use of lethal force, it can be found unreasonable even if it was by itself reasonable. Sheehan. Sheehan is a different case. Sheehan was. Sorry. Did that reference mean that you're saying that it's presumptively unconstitutional during the time before Mendez came down? Yes. Even though the Supreme Court then says it's not unconstitutional. That's the. I use the word conundrum. Well, I don't think it's a conundrum. I think the Supreme Court says what the Constitution says, it applies backwards as well as forwards. I never heard that argument made that you acted unconstitutionally because you acted before the Supreme Court said you were acting constitutionally. Do you have any reference that goes into that conundrum? I looked and I will answer you by saying this, Judge Box, that absent that argument, the other part of it is Graham and the totality of the sentence. That I agree with you on. Okay. Billington. So look at it just as Billington alone. There was no Mendez there yet. What they said was just the Fourth Amendment part of it. So my argument that focuses on the Fourth Amendment, we can take that out based on your question. Okay. The issue about him pulling a knife on the officer, I'm sure the court will read the facts carefully. There was another citizen that called in about the knife, saying he had a knife before the officer arrived. So he didn't pull the knife out and go after the cop. And you can watch the entire 40-minute video and see that as well. Sheehan was dangerous, uncooperative, breaking the law at the time, and hidden in a room. So that was the facts are different. But this focus on the facts, that's the problem with these qualified immunity and the second-prong cases, that you can always find facts that are different. It's just that way. But it's the principle that has to be established, not the facts. The facts have to fit. But it's the principle that you should not, or it's unlawful to shoot somebody that's not an immediate threat, that's suicidal, with a beanbag gun. That's what Glenn and Dorley stand for. Thank you very much. Thank you very much, Counsel. All right. The State of Guyana v. Santa Maria is submitted.
judges: Boggs, Wardlaw, Bea